UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:

GATOR COASTAL SHOPPING CENTRE, LLC,

      Plaintiff,

v.

ZURICH AMERICAN INSURANCE COMPANY,
ACE AMERICAN INSURANCE COMPANY,
ALLIED WORLD ASSURANCE COMPANY,
LTD., UNDERWRITERS AT LLOYD'S,
LONDON SUBSCRIBING TO POLICY NO.
PTNAM1801122, ASPEN SPECIALTY
INSURANCE COMPANY, WESTPORT
INSURANCE CORPORATION,
UNDERWRITERS AT LLOYD'S, LONDON
SUBSCRIBING TO POLICY NO.
PTNAM1802914, TOKIO MARINE AMERICA
INSURANCE COMPANY, LIBERTY MUTUAL
FIRE INSURANCE COMPANY, IRONSHORE
SPECIALTY INSURANCE COMPANY,
UNDERWRITERS AT LLOYD'S, LONDON
SUBSCRIBING TO POLICY NO.
PTNAM1802912, AIG EUROPE LIMITED,
UNDERWRITERS AT LLOYD'S, LONDON
SUBSCRIBING TO POLICY NO.
PTNAM1802913, UNDERWRITERS AT
LLOYD'S, LONDON SUBSCRIBING TO
POLICY NO. 042768061812, UNDERWRITERS
AT LLOYD'S, LONDON SUBSCRIBING TO
POLICY NO. BNPD18AA158Z, HAMILTON RE,
LTD., STARR SURPLUS LINES INSURANCE
COMPANY, AND AON RISK SERVICES
CENTRAL, INC.,

      Defendants.

_____/

## COMPLAINT

1.     This matter involves the liability of the various Defendants (insurers and an insurance

producer) to the Plaintiff-landlord, in Florida, in connection with insurance to have been procured for the

benefit of Plaintiff by the tenant of a commercial building owned by Plaintiff, and over $1,800,000 of physical damage sustained to the building as a result of Hurricane Florence.

**THE PARTIES**

2.      Plaintiff Gator Coastal Shopping Centre, LLC ("Gator") is a limited liability company organized under the laws of the State of Delaware with a principal place of business in the State of Florida. All of the members of the Plaintiff are citizens of the State of Florida.

3.      Upon information and belief, Defendant Zurich American Insurance Company ("Zurich") is a corporation organized under the laws of the State of New York with a principal place of business in the State of Illinois, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

4.      Upon information and belief, Defendant ACE American Insurance Company ("ACE") is a corporation organized under the laws of the State of Pennsylvania with a principal place of business in the State of Pennsylvania, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

5.      Upon information and belief, Defendant Allied World Assurance Company, Ltd. ("Allied World") is a citizen or subject of a foreign state, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

6.      Upon information and belief, Defendant Underwriters at Lloyd's, London Subscribing to Policy No. PTNAM1801122 (referred to herein in the singular, and as "Syndicate No. 318 MSP" or "MSP" for convenience) is a citizen or subject of a foreign state, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

7.      Upon information and belief, Defendant Aspen Specialty Insurance Company ("Aspen") is a corporation organized under the laws of the State of North Dakota with a principal place of business in

the State of Connecticut, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

8.      Upon information and belief, Defendant Westport Insurance Corporation ("Westport") is a corporation organized under the laws of the State of Missouri with a principal place of business in the State of Missouri, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

9.      Upon information and belief, Defendant Underwriters at Lloyd's, London Subscribing to Policy No. PTNAM1802914 (referred to herein in the singular, and as "Syndicate No. 1414 ASC" or "ASC" for convenience) is a citizen or subject of a foreign state, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

10.     Upon information and belief, Defendant Tokio Marine America Insurance Company ("Tokio Marine") is a corporation organized under the laws of the State of New York with a principal place of business in the State of New York, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

11.     Upon information and belief, Defendant Liberty Mutual Fire Insurance Company ("Liberty Mutual") is a corporation organized under the laws of the State of Wisconsin with a principal place of business in the State of Massachusetts, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

12.     Upon information and belief, Defendant Ironshore Specialty Insurance Company ("Ironshore") is a corporation organized under the laws of the State of Arizona with a principal place of business in the State of Massachusetts, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

13.     Upon information and belief, Defendant Underwriters at Lloyd's, London Subscribing to Policy No. PTNAM1802912 (referred to herein in the singular, and as "Syndicate No. 5151 Endurance" or

"Endurance" for convenience) is a citizen or subject of a foreign state, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

14.     Upon information and belief, Defendant AIG Europe Limited ("AIG") is a citizen or subject of a foreign state, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

15.     Upon information and belief, Defendant Underwriters at Lloyd's, London Subscribing to Policy No. PTNAM1802913  (referred to herein in the singular, and as "Syndicate No. 1183 TAL" or "TAL" for convenience) is a citizen or subject of a foreign state, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

16.     Upon information and belief, Defendant Underwriters at Lloyd's, London Subscribing to Policy No. 042768061812  (referred to herein in the singular, and as "Syndicate No. 1955 Barbican" or "Barbican" for convenience) is a citizen or subject of a foreign state, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

17.     Upon information and belief, Defendant Underwriters at Lloyd's, London Subscribing to Policy No. BNPD18AA158Z  (referred to herein in the singular, and as "Syndicate No. 2468 Neon" or "Neon" for convenience) is a citizen or subject of a foreign state, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

18.     Upon information and belief, Defendant Hamilton Re, Ltd. ("Hamilton") is a citizen or subject of a foreign state, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance business in the State of Florida.

19.     Upon information and belief, Defendant Starr Surplus Lines Insurance Company ("Starr") is a corporation organized under the laws of the State of Texas with a principal place of business in the State of Texas, and at all relevant times was licensed and/or authorized to, and/or did, transact insurance

business in the State of Florida; the Defendants set forth in Paragraphs 3-19 of this Complaint are collectively referred to herein as the "Insurers."

20.    Upon information and belief, Defendant Aon Risk Services Central, Inc. ("Aon") is a corporation organized under the laws of the State of Illinois with a principal place of business in the State of Illinois, and at all relevant times was licensed and/or authorized as an insurance producer, agent and/or broker in the State of Florida to transact insurance business in the State of Florida and/or transacted insurance business within the State of Florida.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction of this matter under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.    Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claims raised herein occurred in this judicial district, and the Defendants' are otherwise subject to the Court's personal jurisdiction with respect to this action, within the meaning of 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

23.    Gator owns a commercial shopping center known as Coastal Centre in Conway, South Carolina, which consists of multiple commercial retail buildings and units, including a 94,841-square-foot commercial building with the street address 1610 Church Street, Unit U (the "Building").

24.    On or about September 13, 2018, the Building was subject to a lease between Gator and Kmart Corporation ("Kmart"), originally entered into between Kmart and a prior owner of the Building (the "Lease"); a copy of the Lease will be filed herein as Exhibit A to this Complaint.

25.    The Building was operated by Kmart as Kmart Store No. 7555.

26.     Under, and in connection with, the Lease, Kmart was responsible for providing insurance for Gator, in Florida, and was required by Gator to procure insurance to cover the Building at 100% replacement value, without any deductible or self-insured retention, and including Gator as an insured and loss payee with direct rights to the proceeds of such insurance.

27.     Upon information and belief, Sears Holdings Corporation is the parent company of Kmart.

28.     Upon information and belief, through Aon as the insurance producer, agent and/or broker, and as part of Sears' insurance program, Kmart procured at least $50,000,000 of "all risk" insurance comprised of seventeen different insurance policies issued by the seventeen individual Insurers, with each of the policies containing identical, or near identical, terms and provisions; these policies are referred to herein both collectively and individually as the "Kmart Policy."

29.     On or about June 6, 2018, Aon provided Gator, in Florida, with a certificate of insurance (the "COI") representing the Building as the location to be insured under the Kmart Policy, and representing the Kmart Policy as including, among other things, a $50,000,000 limit for "ALL RISK" building coverage with "WIND" and "FLOOD" coverage, "Replacement Cost Valuation," "No Coinsurance," and coverage for "[a]ll real property owned, acquired by, used by, intended for use by the insured, including real and personal property of others in the insured's care, custody or control"; the COI will be filed herein as Exhibit B to this Complaint.

30.     No deductible amount is listed as being included in the Kmart Policy under the COI's "DEDUCTIBLES" column.

31.     On or about September 13, 2018, the Building sustained significant and direct physical damage caused by or resulting from Hurricane Florence.

32.     The cost to repair the Building exceeds $1,800,000.

33.     Upon information and belief, after the damage was sustained to the Building, Kmart became involved in "Chapter 11" bankruptcy proceedings and rejected the Lease.

34.     Gator has been unable to enter into any subsequent lease with several prospective tenants because of the damage to the Building.

35.     Upon information and belief, Gator is an insured and loss payee under the Kmart Policy with direct rights to the proceeds of the Kmart Policy.

36.     Upon information and belief, the Kmart Policy insures against all risk of direct physical loss or damage to the Building and related business income loss.

37.     Accordingly, Gator requested that Kmart notify the Insurers of the damage to the Building, and that Gator was requesting coverage under the Kmart Policy.

38.     Gator also notified Aon of the damage to the Building, and of its request for coverage, and requested that Aon also notify the Insurers and advise as to whether notice needed to be sent to any other party.

39.     Gator also reported the damage to the Building to the Insurers, and requested coverage under the Kmart Policy.

40.     Gator's requests, including requests by Gator to the Insurers, Aon and Kmart for a copy of the Kmart Policy, have been refused and/or ignored.

41.     The Insurers denied coverage to Gator on the purported basis that the Kmart Policy includes a deductible or deductibles which far exceed the damage to the Building.

42.     Upon information and belief, by the Kmart Policy's express terms, any deductible or deductibles included in the Kmart Policy do not apply to Gator, and the Insurers are obligated to pay Gator without consideration of any deductible or deductibles.

43.     No other insurance policy or insurer has paid Gator in connection with the damage to the Building.

44.     Any conditions precedent, obligations or notices in connection with the Kmart Policy and/or the claims made herein, to the extent such exist or existed, have been satisfied by Gator, and/or the

Insurers and Aon have waived such conditions precedent, obligations or notices, and/or the Insurers and Aon are estopped from denying or limiting coverage based on any alleged failure to satisfy any such conditions precedent, obligations or notices.

## COUNT ONE—BREACH OF CONTRACT (ZURICH)

45.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

46.     Zurich had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

47.     Gator demanded that Zurich pay Gator for the loss sustained as a result of Hurricane Florence.

48.     Zurich has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

49.     Gator has suffered, and continues to suffer, damages as a direct and proximate result of Zurich's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

## COUNT TWO—DECLARATORY JUDGMENT (ZURICH)

50.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

51.     There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

52.     There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether Zurich had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

53.     A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

**COUNT THREE—BREACH OF CONTRACT (ACE)**

54.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

55.     ACE had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

56.     Gator demanded that ACE pay Gator for the loss sustained as a result of Hurricane Florence.

57.     ACE has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

58.     Gator has suffered, and continues to suffer, damages as a direct and proximate result of ACE's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

**COUNT FOUR—DECLARATORY JUDGMENT (ACE)**

59.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

60.     There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

61.     There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether ACE had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

62.     A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

### COUNT FIVE—BREACH OF CONTRACT (ALLIED WORLD)

63.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

64.     Allied World had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

65.     Gator demanded that Allied World pay Gator for the loss sustained as a result of Hurricane Florence.

66.     Allied World has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

67.     Gator has suffered, and continues to suffer, damages as a direct and proximate result of Allied World's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

### COUNT SIX—DECLARATORY JUDGMENT (ALLIED WORLD)

68.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

69.     There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

70.     There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether Allied World had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

71.     A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

## COUNT SEVEN—BREACH OF CONTRACT (MSP)

72. Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

73. MSP had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

74. Gator demanded that MSP pay Gator for the loss sustained as a result of Hurricane Florence.

75. MSP has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

76. Gator has suffered, and continues to suffer, damages as a direct and proximate result of MSP's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

## COUNT EIGHT—DECLARATORY JUDGMENT (MSP)

77. Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

78. There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

79. There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether MSP had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

80. A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

## COUNT NINE—BREACH OF CONTRACT (ASPEN)

81.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

82.     Aspen had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

83.     Gator demanded that Aspen pay Gator for the loss sustained as a result of Hurricane Florence.

84.     Aspen has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

85.     Gator has suffered, and continues to suffer, damages as a direct and proximate result of Aspen's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

## COUNT TEN—DECLARATORY JUDGMENT (ASPEN)

86.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

87.     There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

88.     There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether Aspen had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

89.     A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

**COUNT ELEVEN—BREACH OF CONTRACT (WESTPORT)**

90.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

91.     Westport had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

92.     Gator demanded that Westport pay Gator for the loss sustained as a result of Hurricane Florence.

93.     Westport has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

94.     Gator has suffered, and continues to suffer, damages as a direct and proximate result of Westport's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

**COUNT TWELVE—DECLARATORY JUDGMENT (WESTPORT)**

95.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

96.     There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

97.     There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether Westport had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

98.     A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

## COUNT THIRTEEN—BREACH OF CONTRACT (ASC)

99.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

100.    ASC had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

101.    Gator demanded that ASC pay Gator for the loss sustained as a result of Hurricane Florence.

102.    ASC has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

103.    Gator has suffered, and continues to suffer, damages as a direct and proximate result of ASC's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

## COUNT FOURTEEN—DECLARATORY JUDGMENT (ASC)

104.    Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

105.    There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

106.    There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether ASC had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

107.    A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

**COUNT FIFTEEN—BREACH OF CONTRACT (TOKIO MARINE)**

108.    Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

109.    Tokio Marine had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

110.    Gator demanded that Tokio Marine pay Gator for the loss sustained as a result of Hurricane Florence.

111.    Tokio Marine has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

112.    Gator has suffered, and continues to suffer, damages as a direct and proximate result of Tokio Marine's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

**COUNT SIXTEEN—DECLARATORY JUDGMENT (TOKIO MARINE)**

113.    Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

114.    There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

115.    There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether Tokio Marine had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

116.    A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

-15-

**COUNT SEVENTEEN—BREACH OF CONTRACT (LIBERTY MUTUAL)**

117.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

118.     Liberty Mutual had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

119.     Gator demanded that Liberty Mutual pay Gator for the loss sustained as a result of Hurricane Florence.

120.     Liberty Mutual has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

121.     Gator has suffered, and continues to suffer, damages as a direct and proximate result of Liberty Mutual's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

**COUNT EIGHTEEN—DECLARATORY JUDGMENT (LIBERTY MUTUAL)**

122.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

123.     There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

124.     There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether Liberty Mutual had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

125.     A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

**COUNT NINETEEN—BREACH OF CONTRACT (IRONSHORE)**

126.   Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

127.   Ironshore had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

128.   Gator demanded that Ironshore pay Gator for the loss sustained as a result of Hurricane Florence.

129.   Ironshore has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

130.   Gator has suffered, and continues to suffer, damages as a direct and proximate result of Ironshore's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

**COUNT TWENTY—DECLARATORY JUDGMENT (IRONSHORE)**

131.   Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

132.   There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

133.   There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether Ironshore had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

134.   A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

**COUNT TWENTY-ONE—BREACH OF CONTRACT (ENDURANCE)**

135.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

136.     Endurance had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

137.     Gator demanded that Endurance pay Gator for the loss sustained as a result of Hurricane Florence.

138.     Endurance has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

139.     Gator has suffered, and continues to suffer, damages as a direct and proximate result of Endurance's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

**COUNT TWENTY-TWO—DECLARATORY JUDGMENT (ENDURANCE)**

140.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

141.     There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

142.     There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether Endurance had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

143.     A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

-18-

## COUNT TWENTY-THREE—BREACH OF CONTRACT (AIG)

144.    Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

145.    AIG had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

146.    Gator demanded that AIG pay Gator for the loss sustained as a result of Hurricane Florence.

147.    AIG has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

148.    Gator has suffered, and continues to suffer, damages as a direct and proximate result of AIG's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

## COUNT TWENTY-FOUR—DECLARATORY JUDGMENT (AIG)

149.    Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

150.    There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

151.    There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether AIG had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

## COUNT TWENTY-FIVE—BREACH OF CONTRACT (TAL)

152.    Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

153.    TAL had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

154.    Gator demanded that TAL pay Gator for the loss sustained as a result of Hurricane Florence.

155.    TAL has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

156.    Gator has suffered, and continues to suffer, damages as a direct and proximate result of TAL's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

## COUNT TWENTY-SIX—DECLARATORY JUDGMENT (TAL)

157.    Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

158.    There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

159.    There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether TAL had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

160.    A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

## COUNT TWENTY-SEVEN—BREACH OF CONTRACT (BARBICAN)

161.    Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

162.    Barbican had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

163.     Gator demanded that Barbican pay Gator for the loss sustained as a result of Hurricane Florence.

164.     Barbican has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

165.     Gator has suffered, and continues to suffer, damages as a direct and proximate result of Barbican's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

**COUNT TWENTY-EIGHT—DECLARATORY JUDGMENT (BARBICAN)**

166.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

167.     There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

168.     There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether Barbican had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

169.     A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

**COUNT TWENTY-NINE—BREACH OF CONTRACT (NEON)**

170.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

171.     Neon had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

172.     Gator demanded that Neon pay Gator for the loss sustained as a result of Hurricane Florence.

173.     Neon has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

174.     Gator has suffered, and continues to suffer, damages as a direct and proximate result of Neon's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

### COUNT THIRTY—DECLARATORY JUDGMENT (NEON)

175.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

176.     There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

177.     There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether Neon had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

178.     A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

### COUNT THIRTY-ONE—BREACH OF CONTRACT (HAMILTON)

179.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

180.     Hamilton had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

181.     Gator demanded that Hamilton pay Gator for the loss sustained as a result of Hurricane Florence.

182.     Hamilton has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

183.     Gator has suffered, and continues to suffer, damages as a direct and proximate result of Hamilton's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

## COUNT THIRTY-TWO—DECLARATORY JUDGMENT (HAMILTON)

184.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

185.     There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

186.     There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether Hamilton had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

187.     A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

## COUNT THIRTY-THREE—BREACH OF CONTRACT (STARR)

188.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

189.     Starr had, and has, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

190.     Gator demanded that Starr pay Gator for the loss sustained as a result of Hurricane Florence.

191.     Starr has failed and/or refused to pay Gator for the loss sustained as a result of Hurricane Florence.

192.     Gator has suffered, and continues to suffer, damages as a direct and proximate result of Starr's failure and/or refusal to pay Gator for the loss sustained as a result of Hurricane Florence.

## COUNT THIRTY-FOUR—DECLARATORY JUDGMENT (STARR)

193.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

194.     There exists a question in actual controversy between the parties requiring a declaration of the Court under 28 U.S.C. § 2201.

195.     There is a real, substantial, and justiciable issue in controversy between the parties hereto with respect to their rights and obligations under the Kmart Policy; specifically, whether Starr had, and has, a duty under Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence.

196.     A judicial determination and a declaration of these rights and obligations of the parties is necessary at this time.

## COUNT THIRTY-FIVE—NEGLIGENCE (AON)

197.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

198.     Aon had a duty, among other things, to procure insurance to cover the Building at 100% replacement value, without any deductible or self-insured retention, and including Gator as an insured and loss payee with direct rights to the proceeds of such insurance, and to provide Gator with accurate information regarding the insurance procured.

199.     Gator justifiably relied on Aon to procure insurance to cover the Building at 100% replacement value, without any deductible or self-insured retention, and including Gator as an insured and loss payee with direct rights to the proceeds of such insurance, and to provide Gator with accurate information regarding the insurance procured.

200.     To the extent that any deductible or deductibles under the Kmart Policy apply to Gator, or Gator is not an insured and loss payee under the Kmart Policy with direct rights to the proceeds of the

Kmart Policy, or to the extent that Aon otherwise failed to provide Gator with accurate information regarding the Kmart Policy, or otherwise failed to procure the insurance required by Gator, then Aon breached its duty.

201.     To the extent that any deductible or deductibles under the Kmart Policy apply to Gator, or Gator is not an insured and loss payee under the Kmart Policy with direct rights to the proceeds of the Kmart Policy, or to the extent Aon otherwise failed to provide Gator with accurate information regarding the Kmart Policy, or otherwise failed to procure the insurance required by Gator, then Gator has suffered, and continues to suffer, damages as a direct and proximate result of Aon's acts and/or omissions.

### COUNT THIRTY-SIX—MISREPRESENTATION (AON)

202.     Gator incorporates the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

203.     Aon represented to Gator, among other things, that there was no deductible included in the Kmart Policy, and that Gator is an insured and loss payee under the Kmart Policy with direct rights to the proceeds of the Kmart Policy.

204.     Aon intended for Gator to act and rely on its representations.

205.     Gator reasonably acted and justifiably relied on Aon's representations.

206.     To the extent that any deductible or deductibles under the Kmart Policy apply to Gator, or Gator is not an insured and loss payee under the Kmart Policy with direct rights to the proceeds of the Kmart Policy, or to the extent Aon otherwise failed to provide Gator with accurate information regarding the Kmart Policy, or otherwise failed to procure the insurance required by Gator, then Aon's representations to Gator were false.

207.     To the extent that any deductible or deductibles under the Kmart Policy apply to Gator, or Gator is not an insured and loss payee under the Kmart Policy with direct rights to the proceeds of the Kmart Policy, or to the extent Aon otherwise failed to provide Gator with accurate information regarding

the Kmart Policy, or otherwise failed to procure the insurance required by Gator, then Aon knew or should have known that its representations to Gator were false.

208.    To the extent that any deductible or deductibles under the Kmart Policy apply to Gator, or Gator is not an insured and loss payee under the Kmart Policy with direct rights to the proceeds of the Kmart Policy, or to the extent Aon otherwise failed to provide Gator with accurate information regarding the Kmart Policy, or otherwise failed to procure the insurance required by Gator, then Gator has suffered, and continues to suffer, damages as a direct and proximate result of Aon's  acts and/or omissions.

WHEREFORE, Gator requests that the Court:

1.    Award monetary damages, including compensatory, direct and consequential damages;

2.    Award interest;

3.    Award costs;

4.    Award attorneys' fees;

5.    Declare that the Insurers had, and have, a duty under the Kmart Policy to pay Gator for the loss sustained as a result of Hurricane Florence; and

6.    Award such other and further relief as the Court may deem proper.

### **DEMAND FOR JURY TRIAL**

Gator demands a trial by jury on all issues so triable.

GATOR COASTAL SHOPPING CENTRE, LLC

By:    s/ Mark Goldstein
       FL Bar No: 882186
       1835 NE Miami Gardens Drive, Suite 211
       Miami, Florida 33179
       Telephone: (305) 342-4839
       Email: markgoldstein98@yahoo.com
       *Attorney for Plaintiff*

# EXHIBIT A

Kmart #7555
Conway, South Carolina

Parties        THIS LEASE made and entered into as of this *18TH* day of *OCTOBER*        ,
1993, between Coastal Mall Joint Venture, c/o Baker and Baker, a South
Carolina General Partnership, having its principal office at P.O. Box 12397,
Columbia, South Carolina 29211 (herein referred to as "Landlord"), and KMART
CORPORATION, a Michigan corporation having its principal office at 3100 West
Big Beaver Road, Troy, Michigan 48084 (herein referred to as "Tenant"),

        WITNESSETH: That in consideration of the rents, covenants and conditions
herein set forth, Landlord and Tenant do hereby covenant, promise and agree as
follows:

Demised          1.    Landlord does demise unto Tenant and Tenant does take from Landlord
Premises      for the lease term the following property: Tenant's completed building
(designated Kmart), together with site improvements to be constructed as
hereinafter specified by Landlord at its expense together with land comprising
not less than Nine and 61/100ths (9.61) acres described in Parcel "A" of
Exhibit "A", attached hereto and made a part hereof, and situated in the City
of Conway, County of Horry, State of South Carolina; said building to be in
the locations depicted on Exhibit "B" attached hereto and made a part hereof,
and of the following dimensions:

        Kmart Building: 381'4" in width by 239'4 in depth
        Total Size: 94,841 sq. ft., which includes a portion of the garden shop,
        31' in width by 115'4" in depth, which is enclosed.

        In addition, Landlord shall provide a fenced garden shop area having
        dimensions of 70' in width by 184' in depth, as indicated on Exhibit "B",
        attached hereto.

        Said land, completed building and site improvements, together with all
licenses, rights, privileges and easements, appurtenant thereto shall be
herein collectively referred to as the "demised premises".

        Landlord hereby reserves for itself and its successors and assigns and
gives and grants unto Tenant, including other tenants in the shopping center
located within the land described in Exhibit "A" and their, as well as
Tenant's agents, employees, customers, licensees and invitees the following
licenses, rights, privileges and easements: the use of parking areas, common
areas (including rest rooms and other facilities, if any), roadways, sidewalks
and accessways to public streets and highways indicated on said Exhibit "B",
together with the use of any delivery or servicing areas adjoining Tenant's
said buildings or designated as such on Exhibit "B", which areas shall be
adequate for the passage, unloading and, if necessary, turning around of
trailer trucks and other commercial vehicles.

Term            2.    The term of this lease shall commence upon the "date of occupancy by
Tenant", as that term is defined in Article 11 hereof, and shall terminate
upon such date as shall be twenty five (25) years from the last day of the
month in which said date of occupancy by Tenant shall occur; provided,
however, the term of this lease may be extended as provided in Article 13
hereof. The phrase "lease term", as used in this lease, shall be the term of
this lease and any extension thereof pursuant to said Article 13.

Annual          3.    Tenant shall, during the lease term, pay to Landlord, at such place
Minimum       as Landlord shall designate in writing from time to time, an annual minimum
Rental        rental of FIVE HUNDRED EIGHTY EIGHT THOUSAND SIXTEEN DOLLARS ($588,016),
unless abated or diminished as hereinafter provided, in equal monthly
installments on the first day of each month, in advance, commencing upon the
first day of the lease term; provided, however, in the event the first day of

SE7555.RCB                                                              07/09/93

                                    -1-

the lease term shall not be the first day of a calendar month, then the rental for such month shall be prorated upon a daily basis.

Additional
Rental

4.   In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which Tenant's "gross sales", as hereinafter defined, shall exceed the sum of SEVENTEEN MILLION DOLLARS ($17,000,000.00), Tenant shall pay to Landlord as additional rental an amount equal to one per cent (1%) of gross sales exceeding SEVENTEEN MILLION DOLLARS ($17,000,000.00).

Said additional rental shall be paid on or before the thirtieth (30th) day following the end of each "lease year".  For the purposes of this lease, a "lease year" shall be each successive period of twelve consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year.  Tenant shall on or before the thirtieth (30th) day following the end of each lease year or lesser period, deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period.  The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year.  In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the dollar amounts referred to in the preceding paragraph shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 12 shall have been fulfilled, or an opening for business under Article 11 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within six (6) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement.  Except to the extent that disclosure shall be required for any bona fide sale or mortgage of the demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant or any occupant of the demised premises, whether wholesale or retail, cash or credit (including merchandise ordered on the demised premises and delivered from another place) and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the demised premises, except that the following shall be excluded:

(a)   Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b)   Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such

occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

(c)  Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public;

(d)  Service and interest charges for time payment accounts and charge accounts;

(e)  All sales of merchandise or services made by any food market which shall occupy any portion or portions of the demised premises; and

(f)  All sales of automotive gasoline or diesel fuel.

Should the Tenant at any time elect to discontinue the operation of its store, the Tenant shall give to the Landlord notice in writing of its intention to do so and in such event the Landlord shall have one option, to be exercised by notice in writing given to the Tenant within one hundred twenty (120) days after the date of mailing of the Tenant's aforesaid notice to the Landlord, to cancel and terminate this lease. If the Landlord exercises its said option, this lease shall cancel and terminate on the last day of the month next following the end of said one hundred twenty (120) day period and the Tenant shall be released from any further liability under this lease.

Should the Landlord fail to exercise its said option and should the Tenant at any time thereafter discontinue the operation of its said store then and in any such event, anything in this lease to the contrary notwithstanding, it is hereby mutually agreed that the rent which Tenant shall pay to the Landlord during the remainder of the term of this lease shall be the rent more particularly set forth in said Article 3, and the word "minimum" in said Article 3 shall be deemed deleted. Upon the discontinuance of the operation of said store, all of the covenants and provisions contained in the preceding paragraph of this article shall be of no further force and effect.

Notwithstanding the provisions of the two preceding paragraphs, Tenant shall be entitled, at any time prior to the discontinuance of the operation of its store and the delivery of the notice to Landlord of its election to discontinue its operation (as hereinabove provided) to assign this lease or sublet the whole or any part of the demised premises pursuant to Article 22 hereof; subject, however, to the terms and conditions of this lease including the provisions of Article 4 hereof. Any such assignment or subletting shall not be construed to be a discontinuance of Tenant's operation of its store.

In the event Landlord shall fail to exercise its option to cancel and terminate this lease after receiving notice from Tenant of its intention to discontinue the operation of its store (as hereinabove provided) and Tenant thereafter assigns this lease or sublets the whole or any part of the demised premises pursuant to Article 22, the rent which Tenant or Tenant's assignee shall be obligated to pay to Landlord during the remainder of this Lease shall be the rent more particularly set forth in Article 3 and the word "minimum" in said Article 3 shall be deemed deleted and all the provisions contained in the

LSE7555.RCB

-3-

07/09/93

preceding paragraphs of this Article 4 shall be of no further force and effect.

**Real**
**Estate**
**Taxes**

5.    Tenant shall pay and discharge all ad valorem real estate taxes and all assessments, general or specific, levied against the taxable premises during the term of the Lease, excluding therefrom payment of general or special assessments which are incurred or levied as a result of Landlord's activity in developing the demised premises for Tenant's occupancy.

The term "taxable premises", as used in this lease, shall be that certain land described in Parcel A of Exhibit "A" together with such buildings and other improvements required by Tenant to be constructed thereon by Landlord under the terms of this lease.

Landlord and Tenant shall use their reasonable efforts to obtain a separate tax assessment with respect to the taxable premises.  In the event that a separate tax assessment with respect to the taxable premises cannot be obtained, then for purposes of this lease, the parties shall refer to the office records of the assessing authority including but not limited to worksheets and field reports, in order to obtain the relevant land and building valuations required to calculate Tenant's separate liability for the real estate taxes hereunder.

In the event that neither a separate tax assessment for the taxable premises can be obtained nor an accurate tax liability established from the assessing office records can be determined, the taxes allocable to the taxable premises (and Tenant's share of taxes attributable to the Common Areas) shall be equal to:  (1) Tenant's pro rata share of taxes attributable to the Tenant's Building, plus (2) Tenant's pro rata share of the taxes assessed against the total land described in Exhibit "A".  Tenant's pro rata share of taxes attributable to the Tenant's building shall be computed by multiplying the total tax liability against the buildings located within the land described in Exhibit "A" by a fraction the numerator of which shall be the number of square feet of ground floor area of Tenant's Building at the end of such real estate fiscal tax year (excluding the garden shop) multiplied by 100% and the denominator of which shall be the total number of square feet of ground floor area of all of the buildings located within the land described in Exhibit "A" (excluding Tenant's building) at the end of such real estate fiscal tax year plus the total number of square feet of ground floor area of Tenant's building at the end of such real estate fiscal year (excluding the garden shop) multiplied by 100%.  Tenant's pro rata share of the taxes assessed against the total land described in Exhibit "A" shall be computed by multiplying the total tax liability against the land described in Exhibit "A" by a fraction, the numerator of which shall be the number of square feet of land within the demised premises and the denominator of which shall be the number of square feet of land within the land described in Exhibit "A".  In no event shall Tenant be responsible for the payment of taxes and assessments incurred or levied on other buildings existing on the land other than the taxable premises.

The date of levy of all ad valorem real estate taxes shall be deemed to be the date specified by each applicable taxing jurisdiction for which such taxes become a lien on the taxable premises.  The Tenant's liability and obligation hereunder to pay such ad valorem real estate taxes shall be fully accrued, fixed and final on the date of levy thereof.

To the extent permitted by law, Tenant may pay any such assessment in annual installments.  In the event any such assessment shall be payable in a lump sum or on an installment basis, Tenant shall have the sole right to elect the basis of payment.  If Tenant shall elect to pay such assessment on the installment basis, then Tenant shall pay only those installments which shall become due and payable during the lease term.  Any such installments due and

LSE7555.RCB

07/09/93

payable in the years in which this lease commences and terminates shall be prorated proportionately.

Tenant shall not be chargeable with, nor be obligated to pay any income, profit, inheritance, estate, succession, gift, franchise, or transfer taxes which are or may be imposed upon Landlord, its successors or assigns, by whatsoever authority imposed or howsoever designated.

Written evidence of the payment of taxes and assessments hereunder shall be furnished by Tenant to Landlord upon Landlord's written request therefor.

The amount, if any, by which the ad valorem real estate taxes and assessments payable hereunder exceed Fifty-Six Thousand DOLLARS ($56,000) during any lease year, shall be hereinafter referred to as an "excess tax payment".  All excess tax payments shall be deductible by Tenant from additional rentals, as defined in Article 4, due and payable for such lease year.

In the event Tenant constructs, as provided in Article 16 hereof, additional buildings or structures on any portion of the land described in Parcel A of Exhibit "A", said additional buildings or structures shall be excluded from the taxable premises.  Said additional buildings or other structures shall be separately assessed and all ad valorem taxes and assessments levied thereon shall be paid and discharged by Tenant and shall not be deductible from additional rentals as provided herein.

The Tenant shall have the right to participate in all negotiations of tax assessments.  Tenant shall have the right to contest the validity or the amount of any tax or assessment levied against the taxable premises or the Shopping Center by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises.  Landlord shall, at Tenant's expense, cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any documents required therefor.

Should the Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the Shopping Center, the Tenant will cooperate in such proceedings; provided, however, that Landlord shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises which might result in the termination of this Lease.

Should any of the proceedings referred to in the preceding two paragraphs of this Article 5 result in reducing the total annual real estate tax and assessment liability against the taxable premises, the Tenant shall be entitled to receive all refunds paid by the taxing authorities.  After payment of all of Landlord's and Tenant's expenses incurred in any such proceeding in which a refund is paid, the Tenant shall pay to the Landlord either the balance of such refund or, alternatively, Tenant shall pay to the Landlord that part of the excess tax payment which may have been deducted from additional rent in the tax year for which the refund was granted, whichever amount shall be the lesser.  Any balance of said refund remaining after such payment to Landlord shall belong to the Tenant.  If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost.

New
Building by
<u>Landlord</u>

6.   Tenant's said building and site improvements shall be completed and delivered to Tenant promptly and with due diligence.  If the performance by Landlord of any of its obligations hereunder is delayed by reason of the act or neglect of Tenant, act of God, strike, labor dispute, boycott, governmental

restrictions, riot, insurrection, war, catastrophe, or act of the public enemy, the period for the commencement or completion thereof shall be extended for a period equal to such delay. Subject to delays permitted above, Landlord warrants that a general contract for construction of said buildings and improvements referred to in Articles 1 and 12 hereof shall be let, rough site grading shall be completed and foundations and footings commenced not later than January 1, 1994. If for any reason whatever Landlord shall fail to comply fully with this warranty, Landlord shall so notify Tenant in writing and in such event Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease within sixty (60) days thereafter by notice to Landlord; provided, further, in the event that, regardless of the reason therefor, said buildings and site improvements shall not have been completed in accordance with working drawings and specifications prepared by Landlord as approved in writing by Tenant's Construction Department, and possession thereof tendered to Tenant prior to April 1, 1995, subject to delays permitted above, then Tenant shall, at any time thereafter, have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

Drawings and Specifi- cations

7. Tenant's said building and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with the working drawings and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of Tenant's typical store drawings and specifications, prior receipt of which Landlord hereby acknowledges and which are identified as Set No. K-1117 containing such additions, changes, and modifications as are more particularly set forth in that certain letter dated July 31, 1992, written by Stephen K. Li, A.I.A., Director, Design Division, Construction Dept, Kmart Corporation to Mr. David Baker, Baker Properties, a copy of which letter is attached hereto and marked Exhibit "C".

Said typical plans and specifications are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department:

(a) Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on store layout drawings which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections;

(b) Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

Said working drawings and specifications shall be submitted to Tenant in time to permit a review and approval by Tenant prior to commencement of construction. Such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working drawings and specifications, Tenant shall in writing, inform Landlord of required revisions or corrections thereto which are necessary to conform said working drawings and specifications to the Tenant's typical store drawings and specifications hereinbefore referred to, and Landlord shall make such revisions or corrections and resubmit them for Tenant's final approval. In the event Tenant shall not inform Landlord of such desired revisions or corrections within said sixty (60) days, said working drawings and specifications shall be deemed approved and accepted for the purposes hereof.

LSE7555.RCB

07/09/93

Said typical drawings and specifications, and working drawings and specifications as approved by Tenant shall constitute a part of this lease.

Subsequent to approval of the typical drawings and specifications, in the event that criteria changes to the lease shall be requested by Tenant, which result in a savings to the Landlord in construction costs, then, Landlord shall pay Tenant an amount equal to the savings. In the event such criteria changes result in extra construction costs to the Landlord, then Tenant shall pay Landlord the extra construction costs resulting from such changes.

Guarantee
of
Materials

8. Landlord shall unconditionally guarantee all work performed by or for the Landlord in the construction of Tenant's building and site improvements against defective workmanship and materials for a period of one (1) year from commencement of lease term or date of final acceptance by Tenant, whichever is later, unless a different period of time is expressly stated under a section of the criteria documents and/or job specifications. Landlord shall assign to Tenant any and all guarantees of workmanship and materials which it may receive. This assignment is non-exclusive as to Landlord, and shall not preclude the Landlord's exercise of its rights under the guaranties or warranties on its own accord.

Advance
Possession
for
Fixturing
and
Merchan-
dising

9. For a period of sixty seven (67) days after completion of Tenant's building by Landlord, as set forth in Article 11 (b), Tenant shall have the privilege, rent free of entering said buildings for the purposes of installing stockroom equipment and salesfloor trade fixtures, storing merchandise, training personnel and other pre-opening activities. The Landlord's completion of the building shall be construed to mean the building is substantially complete except connections to tenants equipment, i.e. permanently enclosed, completely decorated inside and out, floor covering installed, electrical system complete, mechanical systems functioning on controls, toilet facilities complete for both sexes, fire protection system including alarms complete.

Landlord shall advise Tenant's Regional Construction Manager in writing ninety (90) days prior to his projected completion date to allow tenant to place orders for fixtures, arrange for personnel and order merchandise.

Parking
and Other
Common
Areas

10. Prior to commencement of the lease term, Landlord shall construct, in accordance with said working drawings and specifications approved by Tenant, on the premises described in Exhibit "A", all of the sidewalks, service drives, parking areas, driveways, streets, curbs, directional signs (not Tenant's pylon) and related improvements, substantially as shown on said working drawings and specifications (all of which improvements shall hereinafter, along with the land thereon constructed, be referred to as the "common areas").

Landlord shall also construct or cause to be constructed upon certain property or rights-of-way contiguous to the premises described in Exhibit "A", all sidewalks, driveways, streets, curbs, acceleration, deceleration and stacking lanes, traffic controls, and signals, directional signs and related improvements in accordance with Exhibit "B" and with said working drawings and specifications and the requirements of any governmental bodies.

Landlord covenants and represents that at the commencement of the lease term, there shall be adequate sidewalks, driveways, roadways and entrances for automotive and pedestrian ingress and egress to and from the demised premises and adjacent public streets and highways, as shown on said working drawings and specifications.

Landlord also covenants that the area within the demised premises provided for the parking of automobiles shall during the lease term be sufficient to accommodate not less than Five Hundred Twenty Nine (529)

**INITIALED**

One Thousand Three Hundred (1,300)

automobiles on the basis of arrangement depicted on Tenant's working drawings and specifications.

Landlord further covenants that the aggregate area depicted on Exhibit "B" provided for the parking of automobiles shall during the lease term be sufficient to accommodate not less than ~~Eight Sixty One (861)~~ automobiles on the basis of arrangement depicted on Tenant's working drawings and specifications.

At least sixty seven (67) days prior to the commencement of the lease term, Landlord shall provide in accordance with said working drawings and specifications as approved by Tenant and as shown on Exhibit "B" all of the sidewalks, service drives, parking areas and entrances, from adjoining public streets to permit receiving and delivering of fixtures, merchandise and other property and to permit parking for persons involved in the pre-opening activities of the Tenant.

<u>Liability Insurance</u>. During the lease term, Landlord at its sole expense shall keep Tenant insured against all statutory and common law liabilities for damage to property or injuries, including loss of life, sustained by any person or persons within or arising out of said common areas, whether caused by Tenant's negligence or otherwise, in a policy or policies with minimum coverage of One Million and No/100 Dollars ($1,000,000) with respect to injury to any one person and Two Million and No/100 Dollars ($2,000,000) with respect to any one accident or disaster, and Five Hundred Thousand and No/100 Dollars ($500,000) with respect to damage to property. All such policies shall bear endorsements to the effect that Tenant is named an additional insured and that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

<u>Indemnification</u>. Landlord further agrees at its sole expense to defend, indemnify and hold Tenant (and all of its officers, agents and employees) harmless against any and all liabilities for damages for claims arising out of said common areas or Tenant's use thereof, by reason of any act, action, neglect or omission on the part of Landlord and/or Tenant.

In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now or at any future time located beyond the limits of the land described in Exhibit "A" utilize the demised premises for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall at its sole expense, upon written request by Tenant, take whatever action as may reasonably be requested under the circumstances to prevent said unauthorized utilization, including the erection of fences or other barricades.

Subject to Landlord's approval, not to be unreasonably withheld, should Tenant, at any time, utilize portions of the common areas for outdoor shows, entertainment or such other uses which in Tenant's judgment tend to attract the public, Tenant shall give Landlord notification of such intended use, a reasonable time in advance thereof, and on request supply Landlord with reasonable proofs of adequate insurance or indemnification against damage to property, injuries to persons and loss of life sustained in connection therewith. In addition, Tenant shall be responsible for any physical damage to said common areas resulting from said use. Rent, if any, from such use shall be included as part of "gross sales" under Article 4 hereof.

Store Opening

11. The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty seven (67) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) Tenant's building and site

LSE7555.RCB

07/09/93

improvements shall be completed in accordance with said working drawings and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 12 shall be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 20 and January 10, the lease term shall not commence until January 11 unless Tenant shall elect to open for business prior to such date. Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 11, and in the event of the exercise of such option, Landlord shall complete said buildings and site improvements as expeditiously as possible; provided, however, if Landlord shall have failed to complete said buildings and improvements according to the said working drawings and specifications within ninety (90) days after Tenant opens for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct, or remedy in all or part any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

Landlord's Represent- ations and <u>Warranties</u>

12. Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, complete the buildings and site improvements substantially in accordance with the site plan depicted on said Exhibit "B", including completion of said common areas in accordance with the provisions of Article 10 hereof. Landlord further represents, warrants and covenants that it will not erect any buildings or other structures on the land described in Exhibit "A" except as shown on said Exhibit "B".

Landlord also represents, warrants, and covenants that a supermarket tenant of at least 31,547 square feet is located within the shopping center premises as depicted on Exhibit "B".

Landlord also represents, warrants and covenants that no instrument restricting the shopping center or encumbrance of Landlord's title to the land depicted on Exhibit "B", including but not limited to Mortgages, Declarations, Leases, Reciprocal Easement Agreements and Operating Agreements, shall impair Tenant's rights or use of the demised premises under this lease or create for Tenant, any additional financial or other obligation not set forth in this Lease and that any restrictions shown on Exhibit "B", including outlot restrictions, shall be strictly enforced by Landlord, its successors and assigns.

Landlord further represents, warrants and covenants that: the land described in Exhibit "A" will, at the commencement of the lease term, be properly zoned for Tenant's intended use (which shall include, without limitation, a retail department store, an enclosed garden shop, an automotive service center and outdoor sales of patio furniture, plants and lawn and garden supplies); the sale of patio furniture, plants and lawn and garden supplies on the sidewalks and any portion of the parking lot is permitted by applicable laws and regulations without additional permits or applications or change in zoning classification; and all necessary governmental consents, permits and approvals for Tenant's intended use have been obtained. Notwithstanding the previous sentence it is agreed between Landlord and Tenant that exterior sales shall be limited to the area cross hatched in red on Exhibit B attached hereto and that said exterior sales shall not prevent pedestrian traffic movement in front of Tenant's building. Landlord shall deliver to Tenant a Certificate of Occupancy prior to the commencement of the lease term.

The completion of the Elizabeth Street extension shall be funded and completed by the local municipality and is not under the direct control of Landlord. In the event that the extension of Elizabeth Street shall not be completed prior to the commencement of the lease term, then Landlord represents, warrants and covenants that this area behind Tenant's building shall be improved by Landlord as depicted on Exhibit "B-1", providing access to Sixteenth Avenue in accordance with Kmart criteria specifications.

LSE7555.RCB

09/23/93

The lease term shall not commence and said annual minimum rental and other charges payable under this lease shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided, further, in lieu thereof, Tenant shall pay monthly in arrears one percent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental set forth in Articles 3 and 4 hereof.

In the event Landlord's representations and warranties shall not be fulfilled within ninety (90) days after commencement of the lease term, Tenant thereafter shall have the option of (i) completing said representations and warranties at Landlord's cost and expense including, without limitation, overhead plus interest at the lower rate of eighteen percent (18%) per annum or the highest rate not prohibited by law, (ii) continue to pay monthly in arrears one percent (1%) of said gross sales until Landlord's said representations and warranties shall be fulfilled or (iii) terminating the Lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

**Options to Extend Lease**

13. (a)   Tenant shall have ten (10) successive options to extend the term of this lease for an additional period of five (5) years on each such option, such extended term to begin respectively upon the expiration of the term of this lease or of this lease as extended and the same terms and conditions as herein set forth shall apply to each such extended term.   If Tenant shall elect to exercise the aforesaid options, it shall do so by giving notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or of this lease as extended.

(b)   Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option.   This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or any extension thereof.   Tenant's rental during this option period shall be the same rental payable under the terms of this lease at the time Tenant notifies Landlord of its intention to exercise this option.

**First Refusal to Purchase Option**

14.   Intentionally omitted.

**Repairs and Maintenance**

15.   Tenant shall make and pay for all maintenance, replacement and repair necessary to keep the demised premises in a good state of repair and tenantable condition, except for the following maintenance, replacement or repair which shall remain the Landlord's sole responsibility:

(a)   all maintenance, replacement and repair to the roof, outer walls and structural portion of the buildings which shall be necessary to maintain the buildings in a safe, dry and tenantable condition and in good order and repair; and

(b)   all repairs, maintenance or replacement of or to the utility services to the building and any underground storm sewers, sanitary sewers, water lines or electrical lines under the parking areas, service drives, streets, sidewalks, driveways, entrances; and

LSE7555.RCB                                                                                      09/23/93

(c)  all  repairs  and  replacement  including  resurfacing  (exclusive  of  sweeping,  striping  and  snow  and  ice  removal)  necessary  to  maintain  all  driveways,  sidewalks,  street  and  parking  areas  free  of  all  settling,  clear  of  standing  water,  and  in  a  safe,  sightly  and  serviceable  condition,  free  of  chuck  holes,  fissures  and  cracks.

Notwithstanding  the  foregoing  provisions  of  Article  15  herein  set  forth,  Landlord  shall  contract  for  sweeping,  striping  and  snow  removal  for  the  parking  areas,  driveways,  sidewalks  and  streets  of  the  premises  and  maintain  same  in  a  clean,  safe,  sightly  and  serviceable  condition.  The  Landlord  shall  further  maintain  all  landscaped  areas.

Tenant  shall  pay  the  Landlord  its  pro-rata  share  of  the  costs  of  maintaining  the  common  areas  as  herein  provided.  Tenant's  said  share  shall  be  based  upon  the  ratio  that  the  ground  floor  area  of  Tenant's  building  bears  to  the  total  gross  ground  floor  area  contained  in  all  buildings  actually  erected  on  any  portion  of  the  land  described  in  Exhibit  "A",  and  depicted  on  Exhibit  "B".  It  is  understood  and  agreed  by  Landlord  and  Tenant  that  Tenant's  share  of  annual  common  area  charge  shall  not  increase  in  excess  of  the  previous  annual  charge  by  more  than  ten  percent  (10%)  and  that  Tenant  shall  not  be  obligated  to  pay  any  costs  in  excess  of  this  increase.

For  purposes  of  this  Article,  the  costs  of  maintaining  the  common  areas  and  common  facilities  shall  mean  the  following:  (1)  all  amounts  paid  for  cleaning  and  sweeping  (which  shall  be  performed  as  often  as  necessary  but  not  less  than  once  weekly)  and  restriping  (which  shall  be  done  not  less  than  once  every  two  years)  of  the  parking  areas,  sidewalks  and  driveways,  including  snow  and  ice  removal,  which  shall  be  performed  as  often  as  necessary;  (2)  maintenance  and  repair  of  planted  or  landscaped  areas;  (3)  maintenance,  repair  and  replacement  of  bulbs  and  light  standards  with  respect  to  the  parking  lot  lighting  and  electrical  cost  of  lighting  if  Tenant's  parking  lot  lighting  is  not  metered  directly  into  Tenant's  meter  as  provided  in  this  Article;  (4)  and  wages  and  salaries  of  persons  directly  and  actually  performing  services  described  herein.  The  cost  of  maintaining  the  common  areas  and  common  facilities  shall  not  include  real  estate  taxes,  capital  expenses,  depreciation,  permit  fees,  electric  lighting  charges  beyond  Tenant's  normal  business  hours  unless  Tenant  is  operating  during  extended  hours,  rubbish  removal  for  other  tenants,  or  other  administrative  expenses,  including  overhead.

Landlord  shall  maintain  accurate  records  with  respect  to  the  aforesaid  costs  and  shall  submit  to  Tenant  a  bill  not  more  often  than  every  30  days  during  the  term  of  the  lease  for  the  amount  required  to  be  paid  by  Tenant  hereunder.  Such  bill  will  set  forth  the  items  and  amounts  charged  to  Tenant  in  reasonable  detail  and  will  reflect  the  calculations  of  Tenant's  obligation.  With  such  bill,  Landlord  shall  also  submit  to  Tenant  copies  of  paid  receipts  to  support  each  said  item  and  amount.  Tenant  shall  pay  such  amounts  within  thirty  (30)  days  after  receipt  of  Landlord's  billing  therefor.

Tenant  may,  upon  seven  (7)  days  notice,  have  Landlord's  records  of  common  area  expenditures  for  the  previous  twelve  (12)  month  period  audited  by  Tenant's  accountant;  should  such  audit  disclose  any  overpayment  by  Tenant,  Landlord  shall  remit  said  overpayment  upon  demand.

Notwithstanding  anything  contained  herein  to  the  contrary,  Tenant  reserves  the  right,  for  any  reason  whatsoever,  at  any  time  upon  thirty  (30)  days  prior  written  notice  to  Landlord  to  assume  the  duties  of  Landlord  to  maintain  the  common  areas  located  within  Parcel  A  of  Exhibit  "A".  If  Tenant  shall  elect  to  maintain  the  common  areas  located  within  Parcel  A  of  Exhibit  "A",  then,  and  in  such  event,  Tenant  shall  not  during  such  period  be  required  to  make  any  contributions  to  the  common  area  costs  as  hereinabove  defined,  however,  Landlord  shall  maintain  the  remaining  portions  of  the  common  area  described  in  Exhibit  "A".

Unless otherwise specified in Tenant's construction criteria referred in Article 7 (Drawings and Specifications), Landlord shall, at Landlord's sole cost and expense, have that portion of the common facilities lighting standards located within the land described in Parcel A of Exhibit "A" metered directly into Tenant's meter and Tenant shall be responsible for the cost of supplying electricity thereto. The balance of the common facilities lighting standards shall be metered into the meters of Landlord's other tenants as depicted on Exhibit "B" or into Landlord's own meter and Landlord's other tenants or Landlord shall be responsible for the cost of supplying electricity thereto.

In the event buildings or improvements constituting the demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the buildings or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed Five Thousand Dollars ($5,000.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

Alterations and Additional Construction
16. Tenant may, within Parcel "A" of Exhibit "A" or on land which it may control outside of the demised premises, at its own expense, from time to time expand its building or make such alterations, additions or changes, structural or otherwise, in and to its buildings as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to drawings and specifications. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.

In the event Tenant, at its own expense, at any time erects or constructs an expansion to its building or an addition, the gross sales made in or from such expansion or addition shall be excluded from gross sales as defined in Article 4 of this Lease on a pro rata basis as follows: the gross sales for percentage rent purposes shall be computed by multiplying the total "gross sales" as defined in Article 4, by the fraction, the numerator of which shall be 94,841 and the denominator of which shall be the total number of square feet within the expanded building, excluding garden shop area.

Tenant covenants and agrees that it shall not permit any mechanic's, laborer's or materialmen's lien to arise against or attach to the demised premises or any part thereof. Notwithstanding the foregoing, Tenant may contest the validity or amount of any such lien provided Tenant notifies Landlord and Landlord's mortgagee in writing of the existence of such lien and Tenant's intention to contest it, Tenant diligently prosecutes such contest and Tenant bonds over or title-insures over such lien to Landlord's and Landlord's mortgagee's reasonable satisfaction.

Utilities
17. Landlord covenants and agrees that the demised premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements as of the commencement of the lease term. Tenant shall pay all charges for utility raw materials (gas, water, sewage, telephone, electricity, etc.) furnished to the demised premises during the lease term.

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition at its sole expense.

Governmental    18.   Tenant shall observe and comply with all requirements of rules,
Regulations   orders and regulations of the federal, state and municipal governments or
              other duly constituted public authority affecting said demised premises
              including the making of non-structural alterations, insofar as they are due to
              Tenant's occupancy; provided, however, in the event such rules, orders and
              regulations shall either (a) require structural changes, including but not
              limited to, the erection of a fire escape or exit, or (b) require
              non-structural changes which would have been required irrespective of the
              nature of the tenancy, then in either such event, the same shall be complied
              with by Landlord at its sole expense.

Exculpation     19.   Anything to the contrary in this lease notwithstanding the covenants
              contained in this lease to be performed by Landlord shall not be binding
              personally, but instead said covenants are made for the purpose of binding
              only the fee simple or leasehold estate which Landlord owns in the demised
              premises; provided, however, the obligations imposed by Article 8 of this
              lease shall be personally binding upon Landlord.

Damage to       20.   From and after the "date of occupancy by Tenant," as that term is
Demised       defined in Article 11 hereof, should Tenant's net worth at any time be less
Premises      One Hundred Million Dollars ($100,000,000.00), upon written request of the
              Landlord or mortgagee, Tenant shall procure fire insurance with extended
              coverage endorsement upon the building erected by Landlord pursuant to Article
              6 hereof in an amount equal to one hundred percent (100%) of the replacement
              value of the building above the foundation walls.   At any time while Tenant's
              net worth shall exceed One Hundred Million Dollars ($100,000,000.00), the
              Tenant may elect to self-insure its obligation to restore.

                  Policies of fire insurance procured pursuant to this Article shall assure
              and be payable to Landlord, Tenant and mortgagee and shall provide for release
              of insurance proceeds to Tenant for restoration of loss.

                  Landlord and mortgagee, if any, shall be furnished certificates from the
              insuring company showing the existence of such insurance.   In case of loss,
              Tenant is hereby authorized to adjust the loss and execute proof thereof in
              the name of all parties in interest.

                  In the event that, at any time during the lease term, the permanent
              improvements then constituting Tenant's building and site improvements shall
              be damaged or destroyed (partially or totally) by fire or any other casualty
              insurable under a standard fire and extended coverage endorsement Tenant
              shall, at its expense, promptly and with due diligence either (1) repair,
              rebuild and restore the same as nearly as practicable to the condition
              existing just prior to such damage or destruction or (2) repair, rebuild and
              restore the same for the same use and purposes but in accordance with such
              plans and specifications as are then generally in use by Tenant for the
              construction of Kmarts and related structures, provided, however, the
              repaired, rebuilt or replaced building will have a value not less than its
              value just prior to said loss.   Anything herein to the contrary
              notwithstanding, it is understood and agreed that if (1) as a result of any
              such damage or destruction during the last two years of the lease term,
              Tenant's fixtures, equipment or other property shall be damaged or destroyed
              in an amount exceeding One Hundred Thousand Dollars ($100,000.00), or (2) if
              such damage or destruction shall have taken place within five years of the
              then scheduled expiration date of the current term of the lease and if the
              extent of such damage or destruction is such that the cost of restoration
              would exceed fifty per cent (50%) of the amount it would have cost to replace
              the Tenant's building on the demised land in its entirety at the time such
              damage or destruction took place, then Tenant may terminate this Lease as of
              the date of such damage or destruction by giving written notice to the
              Landlord within thirty (30) days thereafter and Tenant shall have an
              additional sixty (60) days, rent free, within which to remove its property
              from the demised premises.   If Tenant is carrying fire insurance to one

LSE7555.RCB                                                                    09/23/93

hundred percent (100%) of the replacement value, all the insurance proceeds shall belong to Landlord and/or Landlord's mortgagee as their interest may appear; in the event the property is self-insured at the time of the loss Tenant shall reimburse Landlord and/or the mortgagee for an amount equivalent to the insurance proceeds that would have been paid had insurance been in force, but not to exceed one hundred percent (100%) of the replacement value of the building.  In the event that this Lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

During any period commencing upon the date of any such damage or destruction by fire, the elements or any other casualty whatsoever, and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this lease shall abate in the proportion that the part of Tenant's buildings which shall be untenantable shall bear to the whole.  The term "date of reoccupancy by Tenant", as used herein, shall be the first to occur of the following two dates:   (a) the date upon which Tenant shall open for business in that part of Tenant's buildings rendered untenantable by such damage or destruction, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion of the repairs, rebuilding and restoration required of Tenant herein.

In the event that, at any time during the lease term, any building or buildings within the site depicted on Exhibit "B", other than Tenant's building or buildings, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; or alternatively Landlord shall be required to clear, clean and raze the fire damaged buildings.

Each party hereto has hereby remised, released and discharged the other party hereto and any officer, agent, employee or representative of such party of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty for which insurance (permitting waiver of liability and containing a waiver of subrogation) is carried by the party at the time of such loss, damage or injury to the extent of any recovery by the injured party under such insurance.

Eminent
Domain

21.  In the event all of Tenant's buildings constructed by Landlord shall be expropriated or the points of ingress and egress to the public roadways substantially as depicted on Exhibit "B" be materially impaired by a public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be deprived thereof.

In the event that less than the whole but more than ten percent (10%) of Tenant's buildings constructed by Landlord shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's buildings, constructed by Landlord, and if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said buildings which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like quality and character as existed just prior to such expropriation.  The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and the dollar amounts set forth in the first paragraph of Article 4 shall be reduced in the

proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

Without limiting the foregoing, in the event that any of the land described in Parcel A of Exhibit "A" shall be expropriated by public or quasi-public authority, Landlord shall make every effort to substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on Exhibit "B". If Landlord shall be unable to substitute such lands and if one or more expropriations shall in total deprive Tenant of the use of more than ten percent (10%) of the land described in Parcel A of Exhibit "A", then, in such event, the Tenant shall have the option to terminate this lease at any time within twelve (12) months after such deprivation becomes effective by giving notice to Landlord.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign to Tenant that portion of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

Tenant shall not be entitled to share in any award made by reason of expropriation of Landlord buildings on the demised premises, or any part thereof, by public or quasi-public authority, except as set forth in the preceding paragraph relative to unamortized expenditures by Tenant and then only if the award for such unamortized expenditures shall be made by the expropriating authority in addition to the award for the land, buildings and other improvements (or portions thereof) comprising the demised premises; however, the Tenant's right to receive compensation for damages or to share in any award shall not be affected in any manner hereby if said compensation, damages, or award is made by reason of the expropriation of the land or buildings or improvements constructed or made by Tenant.

Use, Assign-
ment and
Subletting

22. The premises hereby demised may be used for any lawful purpose. Tenant may assign this lease or sublet the whole or any part of the demised premises, but if it does so, it shall remain liable and responsible under this lease.

Notwithstanding the foregoing, Tenant agrees with Landlord that any premises located within the shopping center as depicted on Exhibit "B" including the demised premises shall not be used as a discotheque, dance hall, night club, movie theatre, bowling alley, health club or office building. Furthermore, Tenant agrees that so long as Winn-Dixie, Inc. or its affiliates is operating a supermarket or grocery store o the property described in Exhibit "A" Parcel B, Tenant agrees that no part of the demised premises, being Parcel A of Exhibit "A", shall be used by Kmart Corporation, its successors, assigns, representatives, or heirs for the sale of grocery, meat, produce, dairy, bakery products, pharmaceutical supplies, prescription drugs and medicines, or any of them. Notwithstanding anything herein to the contrary, Kmart Corporation, its successors, assigns, representatives, or heirs may:

     (1)   operate a pharmacy and, as a part of such pharmacy or independently thereof, engage in the sale of pharmaceutical supplies, prescription drugs and medicines on its leased premises in the Shopping Center;

     (2)   engage in the sale of grocery, meat, produce, dairy and bakery products for on or off-premises consumption in an area not to exceed five thousand (5,000) square feet exclusive of aisle space on its leased premises in the Shopping Center in a manner which is incidental to its general retail business; and

     (3)   engage in the operation of a deli, lunch counter, cafeteria or similar facility in which Kmart sells food and beverage which may be consumed on or off its premises.

Notwithstanding the foregoing, the restrictions herein shall be void in the event:

     (1)   Winn-Dixie Supermarket ceases to be that tenant of the building designated on Exhibit "B" as "Winn-Dixie" or

     (2)   Winn-Dixie Supermarket fails to operate a supermarket for a period of 180 days in the building designated on Exhibit "B" as "Winn-Dixie" except for nonoperation due to fire and casualty for a period not to exceed one year.

Signs      23.   The demised premises shall be referred to by only such designation as Tenant may indicate.  Landlord expressly recognizes that the service mark and trademark "Kmart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "Kmart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant.  Landlord further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect at its sole cost and expense upon any portion of the demised premises signs of such height and other dimensions as Tenant shall determine, bearing such legend or inscription as Tenant shall determine.  Tenant shall have the option to utilize the lighting standards in the parking lot for advertising purposes by attaching, or causing to be attached, signs advertising any and all products and services as Tenant shall elect.

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of the demised premises.

Prior to the date of occupancy by Tenant as defined in Article 11 hereof, Landlord shall, subject to Tenant's approval and applicable governmental laws, statutes and ordinances, at Landlord's sole cost and expense, install two (2) shopping center pylon signs at the location designated as "Shopping Center Pylon" on Exhibit "B", attached hereto and made a part hereof.  Such pylon sign shall be designed to permit the installation of other identification signs on same and Tenant shall have the right to install or have installed its identification sign on such pylon.  In the event Tenant shall elect to install or have installed its identification sign on said pylon, Tenant shall reimburse Landlord for a portion of the cost of installing said shopping center pylon; Tenant's portion of said cost to be equal to the cost of said

LSE7555.RCB                                                   09/23/93

installation multiplied by a fraction, the numerator of which shall be the number (1) one and the denominator of which shall be the total number of identification signs installed or to be installed on said pylon, including the shopping center sign. Landlord agrees that it will not allow the placement of other identification signs (other than the shopping center identification sign) on the shopping center pylon that shall be larger than the identification sign permitted to be placed on the shopping center pylon by Tenant and that Tenant's identification sign shall not be subordinate to the identification sign or signs of any Landlord's other tenants permitted to install identification signs on said pylon. Landlord further agrees that, except for the shopping center identification sign, no identification sign other than that of a tenant of the shopping center shall be placed on said shopping center pylon and that no tenant occupying a building of less than seven thousand (7,000) square feet shall be permitted to place an identification sign on said shopping center pylon. After the payment to Landlord of Tenant's proportionate share of said pylon sign, no additional tenant shall be permitted to place its name identification plate on the shopping center pylon without the written consent of Tenant.

It is further agreed between Landlord and Tenant that any pylon sign located on, or for the benefit of any outparcel user, shall be subject to Tenant's approval, and further that Tenant shall not unreasonably withhold its approval, provided in no event shall said outparcel sign be larger in height than the Kmart pylon sign, impair the visibility of the Kmart pylon sign or the Kmart building, or result in a reduction in the size of the Kmart pylon sign due to governmental restrictions.

Ingress and Egress

24. Landlord represents, warrants and covenants that as a consideration for Tenant entering into this lease it will initially provide and will maintain and illuminate, for the period of this lease and any extension thereof, ingress and egress facilities to the adjoining public streets and highways including but not limited to Church Street and Sixteenth Avenue, in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or temporary relocations necessitated by public authority or other circumstances beyond Landlord's control.

Landlord's Remedies

25. If Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of such default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, and in addition to any remedies which Landlord may have at Law or in equity either (a) terminate this lease, or (b) re-enter the demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

Bankruptcy

26. If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all of the property of Tenant shall be

LSE7555.RCB

09/23/93

-17-

appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

Covenant
of Title

27.   Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

Landlord further covenants, represents and warrants that it is seized of an indefeasible estate in fee simple or has a good and marketable leasehold title to the land described in Parcel A of Exhibit "A", free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof), except as follows:

(a)   Public utility easements not impairing Tenant's use of the demised premises.

Landlord shall, without expense to Tenant and within thirty (30) days after written request by Tenant, furnish (a) an ALTA leasehold policy of Title Insurance in form acceptable to Tenant in an amount not less than One Million Dollars ($1,000,000.00) showing that Landlord's title is as herein represented, (b) an as-built survey by a licensed surveyor of the land described in Parcel A of Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

In the event Landlord's estate is derived from a leasehold interest in a ground lease, Landlord shall, prior to the commencement of construction of the improvements required hereunder, deliver to Tenant an agreement executed by the fee owner of the demised premises wherein the fee owner recognizes this lease and Tenant's rights hereunder and agrees that, notwithstanding any default by the Landlord and subsequent termination of said ground lease, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such fee owner unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

Mortgage
Subor-
dination

28.   Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions

LSE7555.RCB

09/23/93

hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease. The agreement shall further contain (i) a certification from the mortgagee that the agreement has been approved by the board of directors or the loan committee of the mortgagee, which approval is reflected in the minutes of said board or committee, and (ii) an undertaking from the mortgagee to continuously maintain the agreement as part of the mortgagee's official records. Attached hereto as Exhibit "D" is an approved form of Subordination, Nondisturbance and Attornment Agreement.

Tenant Indemnifies Landlord

29. During the lease term Tenant shall indemnify and save Landlord, Landlord's partners, agents, officers or directors, as the case may be and Landlord's ground lessor, if any, harmless against all penalties, or demands of whatsoever nature arising from Tenant's use of the Tenant's buildings except those which shall result, in whole or in part, directly or indirectly, from the default or negligence of Landlord or Landlord's ground lessor, if any.

Tenant's Right to Cure Landlord's Defaults

30. In the event Landlord shall neglect to pay when due any obligations on any mortgage or encumbrance affecting title to the demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant, pay said principal, interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand, pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the lower rate of eighteen percent (18%) per annum or the highest rate not prohibited by law, and Tenant may to the extent necessary withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

Condition of Premises at Termination

31. At the expiration or earlier termination of the lease term Tenant shall surrender the demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty. All furniture and trade fixtures installed in said buildings at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option the property specified in said notice shall be the property of Landlord.

Holding Over

32. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the demised premises after the expiration of the lease term, it shall so remain as a tenant, from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

Investment Tax Credit

33. Landlord hereby agrees to elect under the applicable provisions of the Internal Revenue Code, as amended, (hereinafter referred to as the "Code") to pass through to the Tenant all investment tax credit which may be available from time to time in respect of the demised premises under said Code.

Landlord agrees to timely execute all documents required by said Code, and regulations issued thereunder, to enable Tenant to obtain such investment tax credit.

Landlord further agrees to maintain adequate records to enable Tenant to obtain such tax credit and to provide such records to the Tenant upon written request and otherwise to cooperate with Tenant in said matter. Landlord agrees not to destroy or otherwise dispose of such records until written consent to such destruction or disposal has been obtained from Tenant.

Notices        34.  Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office in Troy, Michigan, Attention:  Senior Vice President Corporate Facilities or to any subsequent address which Tenant shall designate for such purpose.  Date of notice shall be the date on which such notice is deposited in a post office of the United States Postal Service.

Captions and   35.  Marginal captions of this lease are solely for convenience of
Definitions    reference and shall not in any way limit or amplify the terms and provision thereof.  The necessary grammatical changes which shall be required to make the provision of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

Successors     36.  The conditions, covenants and agreements contained in this lease
and Assigns    shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  All covenants and agreements of this lease shall run with the land.

Severability   37.  If any one or more of the provisions contained herein shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, unenforceability shall not affect any other provision of this Lease, but this Lease shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

Choice         38.  This Lease shall be construed and enforced in accordance with the
of Law         laws of the State of South Carolina.  The language in all parts of this Lease shall in all cases be construed as a whole according to its fair meaning and not strictly for or against either Landlord or Tenant.

Waiver and     39.  The failure of either party to insist in any one or more instances
Modifi-        upon the strict performance of any one or more of the agreements, terms,
cations        covenants, conditions or obligations of this lease, or to exercise any right, remedy or election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or obligations of this lease or of the right to exercise such right, remedy or election, but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission.  This lease may be changed or amended only by a writing signed by the party against whom enforcement thereof is sought.

No provision of this Lease shall be deemed to have been waived, unless such waiver be in writing signed by Landlord or Tenant as the case may be.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent shall be deemed to be other than on account of the earliest rent then unpaid nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other

LSE7555.RCB                                                        10/11/93

remedy in this Lease provided, and no waiver by landlord in respect to one Tenant shall constitute a waiver in favor of any other Tenant in the shopping center.

Memorandum
of Lease

40.   The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter.

Hazardous
Waste

41.   Landlord represents that it has made a thorough investigation of the physical condition of the Demised Premises, that it is fully familiar with the present and prior uses of the Demised Premises and that there are not now nor have there been any toxic or hazardous wastes or substances wastes or substances used, generated, stored, treated or disposed on the Demised Premises.   Landlord hereby indemnifies Tenant from and against any loss, liability, claim or expense, including, without limitation, cleanup, engineering and attorneys fees and expenses that Tenant may incur by reason of the above representation being false or by reason of any investigation or claim of any governmental agency in connection therewith.   Landlord's representations and indemnity to Tenant under this paragraph shall survive the cancellation or termination of this lease.

Landlord and Tenant each acknowledge that certain environmental contaminants have been identified on and adjacent to the Shopping Center as expressly set forth and located in that certain Corrective Action Plan, dated August 6, 1992, by SPATCO (the "Identified Contaminants").   Landlord represents that the investigation, remediation and removal of the Identified Contaminants is proceeding and shall be completed under the authority and control of the South Carolina Department of Health and Environmental Control as required under applicable South Carolina law, rules and regulations. Landlord hereby defends, indemnifies and holds harmless Tenant, its successors, assigns and subtenants, from and against any loss, liability, claim or expense, including, without limitation, remediation, clean-up, engineering and attorneys' fees and expenses, which Tenant may incur or suffer arising out of, pertaining to or involving the Identified Contaminants. Tenant hereby waives any option to terminate this Lease it may have under this Lease as a result of the Indentified Contaminants (except for breach of warranty or failure to defend or indemnify as herein required).

At any time from the date of this Lease until Commencement Date, Tenant (or Tenant's contractor) may inspect the Demised Premises for the presence of such wastes or substances.   If toxic or hazardous wastes or substances (excluding the Identified Contaminants) are discovered in the Demised Premises, Tenant may cancel this Lease by giving notice to Landlord and returning possession of the premises to the Landlord prior to the Commencement Date, if Tenant has taken possession.

Tenant shall not use the Demised Premises or any portion of the Common Areas for the storage, production or disposal of any hazardous or toxic or regulated substances except in strict accordance with all applicable environmental laws, rules and regulations, including, without limitation, the Superfund Amendments and Reauthorization Act of 1986, the Comprehensive Air Act, the Clean Water Act, the Toxic Substances Control Act, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, the Hazardous Waste Act of 1970, all as they may be amended, modified or replaced, from time to time.   In addition, Tenant shall not install any underground storage tanks on the demised premises without the prior written consent of the Landlord, which may be withheld for any reason. Tenant shall promptly notify Landlord of any notices from governmental authorities related to environmental matters in connection with the Demised Premises, and, in addition, promptly notify Landlord of any violations of any environmental laws, rules and regulations, and Tenant shall immediately take any an all necessary action to

comply with governmental requirements, and to indemnify and hold Landlord harmless for any and all costs, damages, claims and expenses relating to any violation of environmental laws, rules incurred as a result thereof.

**Property Appraisals**   42.   It is understood that, in conjunction with securing its construction financing, Landlord shall obtain an M.A.I. appraisal on the Kmart store and/or the shopping center of which the Kmart store is a part.  Landlord covenants that it shall, prior to commencement of the lease term, at no cost to Tenant, provide Tenant with a complete and certified copy of said M.A.I. appraisal.

Landlord and Tenant agree that it would be impractical and difficult to determine Tenant's damages in the event Landlord failed to provide a copy of said appraisal.  As a consequence, in the event Landlord fails to provide said M.A.I. appraisal, Tenant may upon thirty (30) days written notice to Landlord, make a one time charge to Landlord of Twenty-Five Thousand and No/100 ($25,000.00) Dollars, which amount Tenant may subtract from rents due and payable under the Lease.  Landlord and Tenant agree that said $25,000 shall be deemed liquidated and fixed damages for Landlord's default with respect to the M.A.I. appraisal.

Further, it is understood that in conjunction with securing its permanent financing, Landlord may obtain an additional appraisal on the Kmart store and/or the shopping center of which the Kmart store is a part.  Landlord covenants that, in the event it obtains such an appraisal, it shall provide Tenant with a complete and certified copy of said appraisal, at no cost to Tenant, immediately upon receipt of same by Landlord.  Notwithstanding anything to the contrary in this Lease, Landlord understands and agrees that should Landlord fail to provide said appraisal, Tenant may refuse to provide any requested estoppel letters or subordination agreements with respect to the demised premises.

**Estoppel Certificates**   43.   Tenant agrees to comply with Landlord's reasonable, periodic requests for estoppel certificates or letters certifying that Tenant is in possession of the premises, the date the Lease commenced, the date the primary lease term expires and the rents payable hereunder, in the format attached hereto as Exhibit "E".

**Outlot Restrictions**   44.   Tenant acknowledges and agrees that Landlord may sell or lease the 0.91 acres outparcel depicted as "OP-5" on Exhibit "B", provided that the following restrictions shall be recorded and enforced by Landlord, its successors, assigns, representatives and heirs:



(a)   The outparcel shall contain only a single building.
(b)   The outparcel shall be limited to a one story building not to exceed 30' 25' in height.
(c)   The outparcel shall be limited to the proposed size and configuration as shown on Exhibit "B".

LSE7555.RCB

10/13/93

IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate as of the day and year first above written.

WITNESSES:

COASTAL MALL JOINT VENTURE,

By:  BAKER & BAKER, A South
     Carolina General Partnership
     Its Managing General Partner

By:  _____
     Lee J. Baker
     Its Managing General Partner

By:  _____
     David Baker
     Its Managing General Partner


KMART CORPORATION

By:  _____
     M.L. SAILES    Vice President

Attest: _____
     C.A. RODGERS   Assistant Secretary

STATE OF SOUTH CAROLINA

COUNTY OF RICHLAND

PERSONALLY appeared before me __Mary F. Meredith__ , and made oath that s/he saw the within named Lee J. Baker and David Baker, Managing General Partners of Baker & Baker, a South Carolina Partnership, Managing General Partner of Coastal Mall Joint Venture, sign, seal and as their act and deed, deliver the within-written instrument for the uses and purposes therein mentioned and that s/he, with __Patricia S. Heen__ witnessed the execution thereof.

*Mary F. Meredith*

SWORN to before me this
__30th__ day of __July__ , 1993.

*Elisabeth P. Lidelay*

NOTARY PUBLIC FOR SOUTH CAROLINA

My commission expires: 9/25/94

STATE OF MICHIGAN)
                 )ss:
COUNTY OF OAKLAND)

I do hereby certify that on this *18TH* day of *OCTOBER*, 19*93*, before me, *SANDRA D. SMITH* , a Notary Public in and for the County and State aforesaid, and duly commissioned, personally appeared Michael L. Skiles and *C.A. RODGERS* , known to me to be the Senior Vice President and Assistant Secretary of Kmart Corporation, who, being by me duly sworn, did depose and say that they reside in Rochester and ~~Birmingham~~, *STERLING HEIGHTS*, Michigan, respectively; that they are the Senior Vice President and Assistant Secretary respectively of Kmart Corporation, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires

SANDRA D. SMITH
~~Notary Public, Oakland County, Michigan~~
My Commission Expires August 17, 1996

*Sandra D. Smith*

**EXHIBIT A**

**LAND DESCRIPTION FOR PARCEL A**
**(KMART PARCEL)**

**LANDS OF COASTAL MALL ASSOCIATES, A SC GENERAL PARTNERSHIP**
**CITY OF CONWAY, HORRY COUNTY, SOUTH CAROLINA**

All that certain piece, parcel or tract of land identified as
Kmart Demised Premises Parcel A containing nine and fifty seven
hundredths (9.57) acres, more or less, in the City of Conway,
Horry County, South Carolina, as shown on a plan entitled
"Exhibit B, prepared for Proposed Kmart #7555" dated July 7,
1993, prepared by Cox & Dinkins, Inc., Engineers/Surveyors, and
having the following dimensions, metes, bounds:

Commencing at a Point of Beginning II located on the
northern side of the right-of-way of U.S. Route 501 (Church
Street), and running therefrom north 54°26'39" west along the
northern side of the right-of-way of U. S. 501 (Church Street)
for a distance of 52.73' to a point; thence turning and running
north 35°32'02" east along property described on said plan as B4
(Part of Parcel B) - Outparcel for a distance of 200.00' to a
point; thence continuing and running north 35°32'02" east along
property shown on said plan as B4 (Part of Parcel B) - Outparcel
for a distance of 18.49' to a point; thence turning and running
north 22°19'48" west along property shown on said plan as B4
(Part of Parcel B) - Outparcel for a distance of 31.92' to a
point; thence turning and running north 54°27'58" west along
property shown on said plan as B4 (Part of Parcel B) - Outparcel
for a distance of 74.48' to a point; thence continuing and
running north 54°27'58" west along property shown on said plan as
B4 (Part of Parcel B) - Outparcel for a distance of 119.30' to a
point; thence continuing and running north 54°27'58" west along
property shown on said plan as B4 (Part of Parcel B) - Outparcel
for a distance of 88.02' to a point; thence turning and running
south 35°27'18" west along property shown on said plan as B4
(Part of Parcel B) - Outparcel for a distance of 110.35' to a
point; thence turning and running south 35°40'48" west along
property shown on said plan as B4 (Part of Parcel B) - Outparcel
for a distance of 125.00' to a point; thence turning and running
north 54°26'39" west along the northern side of the right-of-way
of U. S. 501 (Church Street) for a distance of 35.00' to a point;
thence turning and running north 35°40'48" east along property
shown on said plan as "Existing McDonalds" for a distance of
205.37' to a point; thence turning and running north 43°45'27"
east along property shown on said plan as B1 (Part of Parcel
B)for a distance of 60.59' to a point; thence turning and running
north 35°32'01" east along property shown on said plan as B1
(Part of Parcel B) for a distance of 212.27' to a point; thence
turning and running south 54°27'58" east along property shown on
said plan as B1 (Part of Parcel B) for a distance of 178.50' to a
point; thence turning and running north 35°32'02" east along
property shown on said plan as B1 (Part of Parcel B) for a
distance of 196.00' to a point; thence turning and running north
49°12'17" east along property shown on said plan as B1 (Part of
Parcel B) for a distance of 47.10' to a point; thence turning and
running north 35°32'01" east along property shown on said plan as
B1 (Part of Parcel B) for a distance of 154.02' to a point;
thence turning and running north 54°27'58" west along property
shown on said plan as B1 (Part of Parcel B) for a distance of
75.87' to a point; thence turning and running north 21°54'11"
west along property shown on said plan as B1 (Part of Parcel B)
for a distance of 108.36' to a point; thence turning and running
north 43°15'45" east along property shown on said plan as B1
(Part of Parcel B) for a distance of 144.03' to a point; thence
turning and running south 46°44'15" east along the proposed

right-of-way for Elizabeth Street Extension as shown on said plan for a distance of 746.53' to a point; thence turning running south 34°13'12" west along property shown on said plan as B2 (Part of Parcel B) 190.53' to a point; thence turning and running north 58°34'59" west along property shown on said plan as B2 (Part of Parcel B) for a distance of 76.17' to a point; thence turning and running south 33°25'01" west along property shown on said plan as B2 (Part of Parcel B) for a distance of 71.79' to a point; thence turning and running south 56°41'25" east along property shown on said plan as B2 (Part of Parcel B) for a distance of 250.00' to a point; thence turning and running south 33°25'01" west along the western side of the right-of-way of U. S. 501 Business (Sixteenth Avenue) for a distance of 35.56' to a point; thence continuing and running north 54°14'06" west along property shown on said plan as B3 (Part of Parcel B) for a distance of 252.48' to a point; thence continuing and running north 54°14'06" west along property shown on said plan as B3 (Part of Parcel B) for a distance of 224.79' to a point; thence turning and running south 35°38'37" west along property shown on said plan as B3 (Part of Parcel B) for a distance of 189.91' to a point; thence turning and running south 72°58'03" west along property shown on said plan as B3 (Part of Parcel B) for a distance of 9.44' to a point; thence turning and running south 35°44'51" west along property shown on said plan as B3 (Part of Parcel B) for a distance of 22.50' to a point; thence turning and running south 77°42'13" west along property shown on said plan as B3 (Part of Parcel B) for a distance of 52.55' to a point; thence turning and running south 35°32'02" west along property shown on said plan as B3 (Part of Parcel B) for a distance of 149.35' to a point; thence turning and running north 87°41'46" west along property shown on said plan as B3 (Part of Parcel B) for a distance of 46.21' to a point; thence turning and running south 63°13'16" west along property shown on said plan as B3 (Part of Parcel B) for a distance of 61.64' to a point; thence turning and running south 31°22'31" west along property shown on said plan as B3 (Part of Parcel B) for a distance of 136.83' to a point; thence turning and running south 35°37'31" west along property shown on said plan as B3 (Part of Parcel B) for a distance of 58.02' to the point of beginning, be all measurements a little more or less.

*J. Frank Baber*

## EXHIBIT A

### LAND DESCRIPTION

**LANDS OF COASTAL MALL ASSOCIATES, A SC GENERAL PARTNERSHIP**
**CITY OF CONWAY, HORRY COUNTY, SOUTH CAROLINA**

All that certain piece, parcel or tract of land containing twenty
eight and sixty nine hundredths (28.69) acres, more or less, in
the City of Conway, Horry County, South Carolina, as shown on a
plan entitled "Exhibit B, prepared for Proposed Kmart #7555"
dated July 22, 1993, prepared by Cox & Dinkins, Inc.,
Engineers/Surveyors, and having the following dimensions, metes,
bounds:

Commencing at Point of Beginning I located on the
northwestern intersection of the rights-of-way of U.S. Route 501
(Church Street) and U. S. 501 Business (Sixteenth Avenue), and
running therefrom north 50°05'39" west along the right-of-way of
U.S. Route 501 (Church Street) for a distance of 154.99' to a
point; thence turning and running north 53°49'40" west along the
northern right-of-way of U.S. Route 501 (Church Street) for a
distance of 4.99' to a point; thence continuing and running north
53°49'40" west along the northern right-of-way of U.S. Route 501
(Church Street) for a distance of 118.62' to a point; thence
turning and running north 54°26'39" west along the northern
right-of-way of U. S. 501 (Church Street) for a distance of
307.68' to a point; thence continuing and running  north
54°26'39" west along the northern right-of-way of U. S. 501
(Church Street) for a distance of 52.73' to a point; thence
continuing and running  north 54°26'39" west along the northern
right-of-way of U. S. 501 (Church Street) for a distance of
170.00' to a point; thence continuing and running  north
54°26'39" west along the northern right-of-way of U. S. 501
(Church Street) for a distance of 138.99' to a point;  thence
continuing and running north 54°26'39" west along the northern
right-of-way of U. S. 501 (Church Street) for a distance of
35.00' to a point; thence turning and running north 35°40'48"
east along property shown on said plan as "Existing McDonalds"
for a distance of 205.37' to a point; thence turning and running
north 54°10'43" west along property shown on said plan as
"Existing McDonalds" for a distance of 119.02' to a point; thence
turning and running north 54°10'41" west along property
undesignated on said plan for a distance of 193.08' to a point;
thence turning and running north 21°30'00" east along property
undesignated on said plan for a distance of 539.44' to a point;
thence turning and running south 73°57'15" east along property
shown on said plan as "Future Development" for a distance of
275.09' to a point; thence turning and running north 20°00'13"
east along property shown on said plan as "Future Development"
for a distance of 70.19' to a point; thence turning and running
south 69°59'47" east along property shown on said plan as "Future
Development" for a distance of 245.67' to a point; thence turning
and running north 43°15'45" east along property shown on said
plan as "Future Development" for a distance of 120.08' to a
point; thence turning and running north 46°44'15" west along
property shown on said plan as "Future Development" for a
distance of 26.00' to a point; thence turning and running north
43°15'45" east along property shown on said plan as "Future
Development" for a distance of 15.00' to a point; thence turning
and running south 46°44'15" east along the existing right of way
for Elizabeth Street for a distance of 943.70' to a point; thence
turning and running south 33°25'01" west along the western right-
of-way of U. S. 501 Business (Sixteenth Avenue) for a distance of

964.46' to a point; thence turning and running south 80°22'20"
west along the northwestern intersection of the rights-of-way of
U. S. 501 Business (Sixteenth Avenue) and U. S. 501 (Church
Street) for a distance of 21.92' to the point of beginning, be
all measurements a little more or less.

# EXHIBIT B

# ACORD® CERTIFICATE OF PROPERTY INSURANCE

DATE (MM/DD/YYYY)
06/06/2018

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | | CONTACT NAME: | | |
|---|---|---|---|---|
| Aon Risk Services Central, Inc. | | PHONE (A/C, No. Ext): (866) 283-7122 | | FAX (A/C, No.): (800) 363-0105 |
| Chicago IL Office 200 East Randolph Chicago IL 60601 USA | | E-MAIL ADDRESS: | | |
| | | PRODUCER CUSTOMER ID #: 570000034159 | | |

JUN 1 1 2018

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURER A: | Zurich American Ins Co | 16535 |
| INSURER B: | | |
| INSURER C: | | |
| INSURER D: | | |
| INSURER E: | | |
| INSURER F: | | |

INSURED
Sears Holdings Corporation
dba Kmart Corporation
Attn: Risk Management E3-219A
3333 Beverly Road
Hoffman Estates IL 60179 USA

Holder Identifier : 7555

## COVERAGES   CERTIFICATE NUMBER: 570071540283   REVISION NUMBER:

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

RE: Kmart Store No. 7555, Conway, SC.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|---|---|
| A | X PROPERTY | | XPP926068011 | 06/01/2018 | 06/01/2019 | | BUILDING | |
| | CAUSES OF LOSS | DEDUCTIBLES | | | | | PERSONAL PROPERTY | |
| | BASIC | BUILDING | | | | | BUSINESS INCOME | |
| | BROAD | | | | | X | EXTRA EXPENSE | $50,000,000 |
| | SPECIAL | CONTENTS | | | | | RENTAL VALUE | |
| | X EARTHQUAKE | | | | | | BLANKET BUILDING | |
| | X WIND | | | | | | BLANKET PERS PROP | |
| | X FLOOD | | | | | X | BLANKET BLDG & PP | $50,000,000 |
| | X ALL RISK-Subject to Exclusions | | | | | X | Earthquake - Aggrega | $50,000,000 |
| | Blkt B&PP Ded | | | | | X | Flood - Aggregate | $50,000,000 |
| | INLAND MARINE | | TYPE OF POLICY | | | | | |
| | CAUSES OF LOSS | | POLICY NUMBER | | | | | |
| | NAMED PERILS | | | | | | | |
| | CRIME | | | | | | | |
| | TYPE OF POLICY | | | | | | | |
| | BOILER & MACHINERY / EQUIPMENT BREAKDOWN | | | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Coverage subject to the lease requirements, if any. Replacement Cost Valuation; No Coinsurance; Waiver of Subrogation included; Mold Coverage Excluded; All real and personal property owned, acquired by, used by, intended for use by the insured, including real and personal property of others in the insured's care, custody or control; extra expense, contingent extra expense, rents,

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Gator Coastal Shopping Centre, LLC and Gator Development Corp. 7850 NW 146th Street, 4th Floor Miami Lakes FL 33016 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br><br>*Aon Risk Services Central, Inc.* |

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2016/03)   The ACORD name and logo are registered marks of ACORD

COA-70

**ACORD®**

AGENCY CUSTOMER ID:   570000034159

LOC #:

# ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |
| **POLICY NUMBER**<br>See Certificate Number:  570071540283 | |
| **CARRIER**  **NAIC CODE**<br>See Certificate Number:  570071540283 | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:  ACORD 24     FORM TITLE:  Certificate of Property Insurance

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER | |
| INSURER | |
| INSURER | |
| INSURER | |

| **ADDITIONAL POLICIES** | If a policy below does not include limit information, refer to the corresponding policy on the ACORD certificate form for policy limits. |
|---|---|

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|
| | PROPERTY | | | | | |
| A | | XPP926068011 | 06/01/2018 | 06/01/2019 | Boiler & Machinery | Included |

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

LOC #:

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

| POLICY NUMBER | | |
|---|---|---|
| See Certificate Number:   570071540283 | | |

| CARRIER | | NAIC CODE | |
|---|---|---|---|
| See Certificate Number:   570071540283 | | | EFFECTIVE DATE: |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:**   ACORD 24    **FORM TITLE:**   Certificate of Property Insurance

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY

SPECIAL CONDITIONS / OTHER COVERAGES

rental income, leasehold interests, valuable papers, and records, accounts receivable and other coverage's further described in the policy form.

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID:    570000034159
LOC #:

 **ACORD®**

## ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | | NAMED INSURED |
| --- | --- | --- |
| Aon Risk Services Central, Inc. | | Sears Holdings Corporation |
| **POLICY NUMBER** | | |
| See Certificate Number:   570071540283 | | |
| **CARRIER** | **NAIC CODE** | **EFFECTIVE DATE:** |
| See Certificate Number:   570071540283 | | |

**ADDITIONAL REMARKS**

| THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM, |
| --- |
| **FORM NUMBER:**  ACORD 24    **FORM TITLE:**  Certificate of Property Insurance |

Property Program 6/1/18 - 6/1/19

$50,000,000 All Risk Policy Numbers:

Zurich American Insurance Company - XPP926068011 - 10% of $50M
ACE American Insurance Company - RLOD3739824A011 - 10% of $50M
*Allied World Assurance Company, Ltd. - P003839015 - 13.333% of $50M
Syndicate No. 318 MSP (Slip Leader) - PTNAM1801122 - 8.75% of $50M
Aspen Specialty Insurance Company - PXAA52818 - 1.667% of $50M
Westport Insurance Corporation - NAP045210506 - 8% of $50M
Syndicate No. 1414 ASC (Slip Leader) - PTNAM1802914 - 5.25% of $50M
Tokio Marine America Insurance Company - LCP648016707 - 4% of $50M
Liberty Mutual Fire Insurance Company - MJ2L9L426774038 - 4% of $50M
Ironshore Specialty Insurance Company - 000423109 - 2.5% of $50M
Syndicate No. 5151 Endurance (Slip Leader) - PTNAM1802912 - 6.25% of $50M
AIG Europe Limited (Slip Leader) - PTNAM1802875 - 6% of $50M
Syndicate No. 1183 TAL (Slip Leader) - PTNAM1802913 - 4.25% of $50M
*Syndicate No. 1955 Barbican - 042768061812 - 3.5% of $50M
*Syndicate No. 2468 Neon - BNPD18AA158Z - 2.5% of $50M
*Hamilton Re, Ltd. - PX18421701 - 5% of $50M
Starr Surplus Lines Insurance Company - SLSTPTY11075718 - 5% of $50M

As indicated by ( * ), Aon Risk Solutions (U.S) is authorized to generate and distribute certificates in an administrative capacity as evidence of insurance where required by clients of the Insured.

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD